**J. L. and J. R., minors, Individually and as representatives of a class consisting of all persons younger than 18 years of age, now or hereafter received by any defendant for observation or diagnosis and/or detained for care or treatment at any facility within the State of Georgia, pursuant to 1969 Georgia Laws pp. 505–517, informally codified as Georgia Code Annotated § 88–503.1, Plaintiffs,**

v.

**James PARHAM, Individually and as Commissioner of the Department of Human Resources, et al., Defendants.**

Civ. A. No. 75–163–MAC.

United States District Court,
M. D. Georgia,
Macon Division.

Feb. 26, 1976.

---

David Goren, Gerald R. Tarutis, Steven Granberg, Macon, Ga., Georgia Legal Services Program, Guardian ad Litem for plaintiffs. Nancy Lindbloom, Macon, Ga., John Cromartie, Jr., Atlanta, Ga., Joseph J. Levin, Pamela S. Horowitz, Southern Poverty Law Center, Montgomery, Ala., of counsel.

Arthur K. Bolton, Atty. Gen., Robert S. Stubbs, II, Chief Deputy Atty. Gen., Dan A. Langham, Deputy Atty. Gen., Timothy J. Sweeney, Senior Asst. Atty. Gen., Dorothy Y. Kirkley, R. Douglas Lackey, Asst. Attys. Gen., Atlanta, Ga., for defendants.

Before BELL, Circuit Judge, BOOTLE, Senior District Judge, and OWENS, District Judge.

OWENS, District Judge:

This lawsuit was begun by two boys, one twelve and one thirteen years of age, known herein by their initials—J. R. and J. L.—to secure their release from more than five years of confinement in Georgia's mental hospital at Milledgeville pursuant to Georgia's mental health laws providing for the voluntary admission of minor children to mental hospitals by parents or guardians, to wit: 1933 Ga.Code Ann. §§ 88–503.1, 503.2, 503.3, 1969 Ga.Laws 505, 517–18:

"88–503.1 *Authority to receive voluntary patients,*—(a) *The superintendent*[1] *of any facility*[2] *may receive for observation and diagnosis* any individual 18 years of age, or older, making application therefor, *any individual under 18 years of age for whom such application is made by his parent or guardian* and any person legally adjudged to be incompetent for whom such application is made by his guardian. *If found to show evidence of mental illness*[3] *and to be suitable for treatment, such person may be given care and treatment at such facility and such person may be detained by such facility for such period and under such conditions as may be authorized by law.*" (emphasis added).

"(b) The superintendent of any evaluating facility may receive for observation and diagnosis any individual 14 years of age or older who makes application therefor. If such individual is under 18 years of age, his parent or guardian may apply for his discharge and the superintendent shall release the patient within five days of such application for discharge.

"88.503.2. *Discharge of voluntary patients.—The superintendent of the facility shall discharge any voluntary patient who has recovered from his mental illness or who has sufficiently improved that the superintendent determines that hospitalization of the pa-* tient is no longer desirable. He may also discharge any voluntary patient, if to do so would, in his judgment, contribute to the most effective use of the facility in the care and treatment of mentally ill persons: Provided, however, that in no event shall any such patient be discharged if, in the judgment of the superintendent of such facility, such discharge would be unsafe for the patient or others." (emphasis added).

"88.503.3. *Right of voluntary patients to discharge on application.*—(a) *A voluntary patient* who is admitted to a facility pursuant to section 88–503.1, *or his legal guardian, parent, spouse, attorney or adult next-of-kin, may request his discharge in writing* at any time after five days following his admission to the facility, excluding Saturdays, Sundays and legal holidays. This request may be submitted to the superintendent or to any staff physician or staff registered nurse of the facility for transmittal to the superintendent. If the patient or another on his behalf makes an oral request for release to any staff physician or staff registered nurse, the patient must, within three days, Saturdays, Sundays and legal holidays excluded, be given assistance in preparing a written request. If a written request is submitted to a staff physician or staff

---

**1.** Section 88–501 includes the following definition:

" 'Superintendent' shall mean the chief medical officer of any facility receiving patients under the provisions of this Chapter or a physician appointed as the designee of such superintendent."

**2.** " 'Facility' shall mean any State-owned or State-operated hospital or other facility utilized for the diagnosis, care, treatment, training, or hospitalization of persons who are mentally ill, any facility "operated or utilized for such purpose by the United States Veterans Administration or other Federal agency, and any other hospital within the State of Georgia approved for such purpose by the department." *Id.* at (c).

**3.** " 'Mentally ill' shall mean having a psychiatric disorder which substantially impairs the person's mental health." *Id.* at (a). It is interesting to note that the present law adopted a less stringent standard for voluntary admission than previously existed. Under prior law a person could be admitted on a voluntary basis only if "found to be a mentally ill person." 1964 Ga.Laws 499, 532 (§ 88–502), *amending* 1960 Ga.Laws 837, 839. A "mentally ill person" was defined in the 1964 statute as "a person who is afflicted with a psychiatric disorder which substantially impairs his mental health; and because of such psychiatric disorder requires care, treatment, training, or detention in the interest of the welfare of such person or the welfare of others of the community in which such person resides . . . ." 1964 Ga.Laws 499, 530 (Section 88–501(a)). The 1960 definition is substantially the same. 1960 Ga.Laws 837, 838.

registered nurse, the physician or nurse shall deliver the request to the superintendent within 24 hours. Within five days, excluding Saturdays, Sundays and legal holidays, of the delivery of a written request for release to the superintendent, the patient must be discharged from the facility unless the superintendent finds that the discharge would be unsafe to the patient or others, in which case proceedings for involuntary hospitalization must be initiated under section 88–506.3 prior to the expiration of such five-day period. If the patient was admitted on his own application and the request for discharge is made by a person other than the patient, the discharge may be conditioned upon the agreement of the patient thereto. *If the patient was admitted before the age of 18 on the application of his parent or guardian under section 88–503.1, his discharge prior to becoming 18 years of age may be conditioned upon the consent thereto of his parent or guardian.* If the patient was admitted as an adjudged incompetent on the application of his guardian under section 88.503.1, his discharge prior to a legal restoration of competency may be conditioned upon the consent thereto of his guardian.

(b) Notwithstanding any other provision of this Chapter, *proceedings for the involuntary hospitalization of* an

individual received by a facility as a *voluntary patient shall not be commenced unless the discharge of the voluntary patient is first requested as provided in subsection (a) hereof."* (Emphasis added).

J. R. was born on August 14, 1962. Approximately three months after birth a juvenile court because of severe parental neglect, removed him from his parents' home and placed him in a foster home under the supervision of the Georgia Department of Family and Children Services. After having lived in a total of seven different foster homes, when he was almost eight years of age he was admitted by the defendant on June 25, 1970, to Georgia's oldest and largest mental hospital, called Central State Hospital at Milledgeville, Georgia. In each foster home it seemed that he had lost his place to a more favored child. On October 27, 1966, a juvenile court order had given "permanent custody for the purpose of placing said child for adoption"[4] to the Georgia Department of Family and Children Services. Adoption did not materialize, and without further court hearing or order J. R. remained in the custody of the Department of Family and Children Services in said foster homes until that department applied directly to said mental hospital for his admission to said mental hospital pursuant to § 88–503.1. Upon admission

**4.** Georgia's Juvenile Court statute then provided:

"24–2421. *Findings, decrees, and orders; probation*—When a child is found by the court to come within its jurisdiction, the court shall so decree and in its decree shall make a finding of the facts upon which the court exercises its jurisdiction over such child.

"(2) Upon finding the child to be in a state of neglect, dependency, or living under insufficient and improper guardianship; or to be the subject of controversy as to his legal custody; or to be a person in need of supervision; the court may, by order duly entered, proceed as follows:

"(a) Take custody of the child and place the child under supervision in his own home or in the custody of a suitable person or agency upon such condition as the court shall determine.

"(b) When conditions and circumstances warrant the termination of parental rights, the court may take custody of the child or children involved for suitable placement or *adoption* and may act in loco parentis in all matters pertaining to their interests. *In such cases the court shall act as guardian of the person and property of the child or children involved."* Ga.Code Ann. § 24–2421 *repealed and superseded,* Juvenile Court Code, 1971 Gal.Laws 709, 1933 Ga.Code Ann. Tit. 24A.

In spite of this court's expressed amazement as to the practice of State departments and officials acting as guardians of minor children under the challenged statute, the defendants have not yet explained the authority for their doing so. In particular they do not explain how the Juvenile Court's guardianship responsibilities transferred to them without a hearing having been held or court order having been issued.

he was found by hospital personnel to be mentally ill, and his mental illness was described as "1. Borderline mental retardation 310.90.[5]—2. Unsocialized, aggressive reaction of childhood 308.40".[6] Exhibit 7. In early 1973, hospital personnel began requesting the Department of Family and Children Services to remove J. R. from hospital confinement and place him in a long-term foster or adoptive home because of a feeling that he "will only regress if he does not get a suitable home placement, and as soon as possible." Exhibit 9–A–2. On August 9, 1973, hospital personnel "felt that efforts to obtain a foster placement should be primary at this time, lest [J. R.] become a permanently institutionalized child." Exhibit 10–A–2. A foster home was not obtained for J. R., and he remained in confinement. On October 24, 1975, when this lawsuit was filed, he had been confined for five years and four months of his thirteen years, two months of life.

J. L. at birth on October 1, 1963, was adopted. His parents divorced when he was three, and he went to live with his mother. She remarried and soon gave birth to a child. On May 15, 1970, his mother and step-father, pursuant to the previously quoted state law § 88–503.1, applied for his admission to what is now Central State Hospital; he was admitted. Hospital personnel found that J. L. was mentally ill and diagnosed his illness as "Hyperkinetic Reaction of Childhood 308.00."[7] On September 8, 1972, he was discharged to his mother, but she brought him back to the hospital and readmitted him ten days later. He then remained in the hospital in confinement, and at the time this lawsuit commenced had been in confinement for five years and five months of his twelve years, one month of life. In 1973 hospital personnel indicated to the Department of Fam-

ily and Children Services that J. L. needed to be removed from hospital confinement and placed in specialized foster care. His records show that the Department of Family and Children Services indicated that the department could not pay for institutionalized (private) foster care unless J. L. was eligible for such care to be paid for by A.F.D.C. or Social Security funds. He was not an A.F.D.C. eligible child. See Exhibit 1. Specialized foster care was not obtained for J. L. by the defendants.

J. R. and J. L. filed this lawsuit against defendant James Parham, Commissioner of Georgia's Department of Human Resources which has responsibility for the Division of Mental Health, the Department of Family and Children Services and the Division for Children and Youth;[8] defendant Dr. Douglas Skelton, Director of the Division of Mental Health; and defendant Dr. W. T. Smith, Chief Medical Officer of Central State Hospital. In doing so they sought and were allowed to proceed without opposition pursuant to Rule 23, Federal Rules of Civil Procedure, individually and as representatives of the class consisting "of all persons younger than 18 years of age now or hereafter received by any defendant for observation and diagnosis and/or detained for care and treatment at any 'facility' within the State of Georgia pursuant to" the statute identified as § 88–503.1. Court's order of November 17, 1975. Discovery and information furnished by the defendants disclosed that on any given date approximately two hundred children under 18 years of age are confined in one of Georgia's eight mental hospitals pursuant to said law. Deposition of Dr. John Filley p. 64.

The plaintiffs filed their complaint against the defendant State officials un-

---

5. This nomenclature is derived from the Diagnostic and Statistical Manual of Mental Disorders published by the American Psychiatric Association.

6. *Id.*

7. See n. 5.

8. The Executive Reorganization Act of 1972 transferred these various responsibilities to one department, the Department of Human Resources, 1972 Ga.Laws pp. 1015, 1046.

der 42 U.S.C. § 1983 [9] alleging that they and the minor children in the class have been deprived of their liberty without procedural due process of law in violation of the Fourteenth Amendment to the Constitution of the United States which states:

> "Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; *nor shall any State deprive any person of life, liberty, or property, without due process of law;* nor deny to any person within its jurisdiction the equal protection of the laws." (emphasis added).

They contend their constitutional rights are violated by the operation of the statutory scheme by which they have been and are being involuntarily confined in state mental hospitals "without being afforded a meaningful and complete opportunity to be heard," and further, by which they are incarcerated "without initial and periodic consideration of placement in the least drastic environment." Complaint at 9. Plaintiffs also contend that this statute unconstitutionally permits parents and guardians and defendants to cause their involuntary commitment to state mental hospitals under the guise of a "voluntary" procedure. They do not constitutionally attack, and this court is not called upon to approve or disapprove, this statute's requisite standard for voluntary treatment of the mentally ill—"If found to show evidence of mental illness and to be suitable for treatment . . ." § 88–503.1(a).

Plaintiffs prayed for a declaratory judgment, an injunction and damages and asked that a district court of three judges be convened pursuant to 28 U.S.C. §§ 2281 and 2284 to hear and determine their prayer for an injunction to restrain the operation of this state statute. On November 5, 1975, this district court of three judges was designated and composed.

The defendants assert that Georgia's voluntary admissions statute, rather than being state action unconstitutionally depriving the plaintiffs of their liberty, is a system of mental health care designed and offered by the state as *parens patriae* [10] to parents to assist them in their traditional parental duty of providing for the "maintenance, protection and education of his children." 1933 Ga.Code Ann. § 74–105. Moreover, the hospitalization of the plaintiffs is merely the acceptance by the parent for his child of the state's designed and offered mental health care system. They go on to suggest that a child is constitutionally protected (a) upon admission by his parents and the professional psychiatric judgment of defendants and the other doctors and personnel of Georgia's eight mental hospitals and (b) during hospitalization by the ever-present parental interest and/or the statutory command that "the superintendent of the facility *shall discharge* any voluntary patient who has recovered from his mental illness or who has sufficiently improved that the superintendent determines that hospitalization is no longer desirable. . . ." § 88–503.2. The plaintiffs,

---

**9.** 42 U.S.C. § 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

**10.** *Parens patriae* means "Father of his country; parent of the country. In England, the king. In the United States, the state, as a sovereign—referring to the sovereign power of guardianship over persons under disability; *In re Turner,* 94 Kan. 115, 145 P. 871, 872, Ann. Cas.1916E, 1022; such as minors, and insane and incompetent persons; *McIntosh v. Dill,* 86 Okl. 1, 205 P. 917, 925." Black's Law Dictionary, Revised Fourth Edition, p. 1269.

they say, have shown no compelling reason for interference with this statutorily fostered relationship between the parent, his child and psychiatric and other professional staff of Georgia's mental health system.

The court convened on November 19, 1975, and heard from the parties. More than twenty depositions of lay and expert witnesses have been taken; hospital records and statistical evidence have been produced. The attorneys for each side have adequately and fully briefed the issues. *Amici* the National Juvenile Law Center, St. Louis University School of Law and the Child Advocacy Project of the American Civil Liberties Union Foundation of Georgia, Inc. have also submitted extensive briefs. On two separate occasions the three judges of this court have visited two of Georgia's eight regional mental hospitals—Central State Hospital at Milledgeville, and Atlanta Regional Hospital at Atlanta—and witnessed for themselves the facilities in which plaintiffs are confined. During those visits the court talked at length with the defendants, hospital personnel and some of the plaintiffs. No further hearings are deemed necessary and the case is now ready for decision.

## JURISDICTION

The court has jurisdiction of plaintiffs' complaint filed pursuant to 42 U.S.C. § 1983 under 28 U.S.C. §§ 1343(3), 2201 and 2202. The prayer for injunctive relief restraining the operation of the allegedly unconstitutional state statute by defendant state officials is required to be heard by a district court of three judges. 28 U.S.C. §§ 2281, 2284.

## THE FACTS

The State of Georgia through its Department of Human Resources now provides a comprehensive state-wide program of treatment services for mentally ill children and adults at public expense. Out-patient services are rendered at approximately fifty community mental health centers serving children and adults. In-patient, confinement care is provided in eight regional hospitals [11] —seven of which were opened within the last ten years—located in Atlanta, Milledgeville, Rome, Savannah, Thomasville, Augusta, and Columbus.

The magnitude of Georgia's program for the mentally ill is demonstrated by the fact that for fiscal year 1976, of the legislature's total appropriation of $379,030,100.00 state money for the Department of Human Resources, $121,106,626.00 is expressly budgeted for out-patient and in-patient mental health [12] services. In addition the state received and spent $28,685,233.00 federal and other money for these services. $149,791,859 was thus expended for mental health care in this state in one year. [12a]

At the end of 1969 a total of 10,643 [13] mentally ill persons were confined in this

---

11. The eight regional hospitals and their first year of operation are:

| | |
|---|---|
| Central State, Milledgeville | 1842 |
| Southwestern, Thomasville | 1966 |
| Georgia Mental Health Institution, Atlanta | 1965 |
| Atlanta Regional | 1968 |
| Augusta Regional | 1969 |
| Savannah Regional | 1970 |
| Northwest Georgia, Rome | 1975 |
| West Central Georgia, Columbus | 1974 |

12. These totals exclude the Georgia Retardation Center and Gracewood State Hospital which serve only the mentally retarded. Since services for mentally retarded are not completely separated from those for the mentally ill, these figures do include all other services for the mentally retarded.

12a. Source: State of Georgia Budget Report Fiscal Year 1977, Vol. I.

13. Statistical Abstract of the United States, 1972.

state's mental hospitals; in addition some 1,864 persons were in state institutions for the mentally retarded. According to the defendants, 7,523 mentally ill and mentally retarded persons were in confinement at the end of 1975.

Children under 18 years of age are cared for as both out-patients and in-patients. In fiscal year 1974 more than 5,596 children received out-patient mental health services and 812 were admitted as mentally ill in-patients. Of these 812 children, 515 were admitted by their parent or guardian, or the defendants as custodians, pursuant to the voluntary admissions statute herein attacked, and 297 were involuntarily or court committed. Figures furnished by the defendants show the following admissions of mentally ill children as in-patients:

| Fiscal Year | Voluntary | Percentage | Involuntary | Percentage |
|---|---|---|---|---|
| 1969 | 50 | 35 % | 94 | 65 % |
| 1970 | 84 | 65 % | 46 | 35 % |
| 1971 | 131 | 82 % | 28 | 18 % |
| 1972 | 246 | 74 % | 88 | 26 % |
| 1973 | 458 | 72 % | 181 | 28 % |
| 1974 | 515 | .63 % | 297 | 37 % |
| 1975 | 445 | 58 % | 317 | 42 % |
| 1976 | 110 | 65 % | 60 | 35 % |
| | 2,039 | 65 % | 1,111 | 35 % |

While Dr. Filley has testified (Deposition, p. 64) that usually on any given day some two hundred children are in the state's eight regional mental hospitals as voluntary admittees, actual figures furnished [14] for October 31, 1975, show that 140 children were confined on that day as voluntary admittees (and are members of the plaintiff class) and had then been confined for an average time of 249.9 days. The minimum time of confinement was 6 days and the maximum time was 2,035 days, almost six years.

14. Members of Plaintiff Class – October 31, 1975

| Hospital | Total Children Confined | Average time of confinement | Minimum time of confinement | Maximum time of confinement |
|---|---|---|---|---|
| Southwestern at Thomasville, Ga. | 10 | 100 days | 17 days | 397 days |
| Central State at Milledgeville, Ga. | 37 | 456 days | 22 days | 2,035 days |
| Atlanta Regional at Atlanta, Ga. | 21 | 161 days | 6 days | 730 days |
| Georgia Mental Health Institute at Decatur, Ga. | 26 | 346 days | 18 days | 1,244 days |
| Augusta Regional at Augusta, Ga. | 14 | 92 days | 13 days | 261 days |
| Savannah Regional at Savannah, Ga. | 16 | 127 days | 15 days | 165 days |
| West Central at Columbus, Ga. | 16 | 71 days | 26 days | 179 days |
| TOTALS | 140 | 249.9 days | 6 days | 2,035 days |

(source – December 19, 1975, affidavit of Cynthia Arnold, a Secretary for Division of Mental Health and Mental Retardation, Department of Human Resources)

The approximately 200 plaintiff class minor children are emotionally disturbed, non-psychotic [15] children in need of other than out-patient, community mental health clinic care. For their care the State affords only confinement or detention in one [16] of Georgia's eight regional mental hospitals.

Defendant Parham as Commissioner of the Department of Human Resources also has responsibility for a division known as "D.F.A.C.S." or Division of Department of Family and Children Services. That division administers to needy families and children, both those eligible for A.F.D.C. or social security funds and others. The division of mental health can and does request the "D.F.A.C.S." to make arrangements for children to be removed from one of the regional mental hospitals and placed in a foster home or a specialized foster home. The term foster home means private citizens who volunteer for nominal compensation ($3.40 to $4.45 per day per child) to keep children in their home. As volunteers they keep only those children they want to keep and keep them only as long as they want to. Specialized foster homes are foster home parents who agree to keep one or two children who are in need of individual, special care and attention. An additional compensation of $125.00 per month, plus $1.75 per child per day is paid. The division now has some 3,700 children in foster homes and space for some 26 children in 13 specialized foster homes. Seven addi-tional specialized homes have been budgeted for several years, but no volunteer parents have appeared. The evidence shows that no organized effort and very little, if any, other effort has been made by the defendants to establish these 7 specialized foster homes.

In early 1973, a Study Commission on Mental Health Services for Children and Youth was formed at the request of Dr. Gary E. Miller, then Director of the Division of Mental Health. After a SIX MONTHS study of the then five regional hospitals, the eight members [17] reported many things in their November 9, 1973, detailed account, among which are:

"1. Children and Youth are *still dependent,* living and growing under the auspices of others, dependent upon someone else for their psychological maturation and their material and physical well-being.

"A child is dependent upon someone else for identifying his need for help and in seeking assistance. Therefore, there are no true 'voluntary' child admissions, and criteria must be established to protect children from needless institutionalization or from the assumption that every child in crisis needs service at a regional hospital." (Report of Commission at 6).

\*    \*    \*    \*    \*    \*

"4. Children learn from their environment and adapt themselves to it. Such adaptation usually becomes an integral part of the child's personality. A child

15. Psychotic is synonymous with *insane, lunatic, mad, crazy*—Reader's *Digest Family Word Finder,* 1975.

16. The defendants have regionalized Georgia's mental hospitals for the purpose of locating patients near their homes and loved ones, so that their family and friends can visit and assist in the treatment program. The court notes that this plan is not uniformly administered by the defendants—one of the named plaintiffs under the plan should be at Georgia Mental Health Institute instead of at Central State Hospital. This may signal a need for mandatory policies, rules and regulations.

17. The members were: Marquis C. Baeszler, ACSW, Director, Children's Program, Clayton County CCMHC: Norbert Enzer, M. D., Professor and Chairman, Department of Psychiatry, Michigan State University; James C. Flanagan, M. D., Atlanta; Barbara Harvey, R. N., Division of Mental Health, Georgia Department of Human Resources; J. I. Riddle, M. D., Director, Western Carolina Center, Morganton, N. D.; William W. Swan, Ed. D., Coordinator of Evaluation, Technical Assistance for Psychoeducational Centers, Athens; Richard S. Ward, M. D., Emory University School of Medicine; Mary M. Wood, Ed. D., University of Georgia.

institutionalized for long periods of time may learn and assimilate 'institutionally appropriate' behavior which in turn is an additional handicap if he is to return to his normal environment. Therefore, all forms of 24-hour care should simulate a *normal childhood environment* to the extent possible and should maintain regularly scheduled home visiting from the time of initial admission.

"5. While certain children do require long-term institutional care, it is extremely important that they receive continued evaluation and reappraisal so that they can be provided alternative forms of care at an optimal time. Therefore, it is imperative that appropriate discharge placement plans be started at the time of admission; this, of course, presupposes a variety of community facilities." (Report of Commission at 7).

\* \* \* \* \* \*

"The commission suggests that State improvement of mental health services to children and youth is urgently needed.

"[I]t is very difficult to estimate the needs of mental health services for children and youth in Georgia for a number of reasons:

1. There are no established State program standards.

2. There is no State plan for mental health services to children and youth. There is no data collection system describing present services for children and youth as a basis for intelligent planning.

3. There are so few appropriate services that recommendations for length of treatment, required 'bed space', and alternative services can only be educated guesses. In most of Georgia, for a disturbed child or youth, there are only two sources of service—a Youth Development Center or a Regional Mental Hospital. It is clear that not all disturbed children benefit from either of these types of programs." (Report of Commission at 9–10).

\* \* \* \* \* \*

"The commission supports the position of a majority of professionals involved in child and youth treatment that there are many alternative forms of both 24-hour care and community-based out-patient care which are preferable alternatives to hospitalization yet which, with a few notable exceptions, do not exist at present in Georgia." (Report of Commission at 11).

\* \* \* \* \* \*

"IT IS THE OBSERVATION OF BOTH HOSPITAL PERSONNEL AND THE COMMISSION THAT MORE THAN HALF OF THE HOSPITALIZED CHILDREN AND YOUTH WOULD NOT NEED HOSPITALIZATION IF OTHER FORMS OF CARE WERE AVAILABLE IN COMMUNITIES." (Report of Commission at 24).

\* \* \* \* \* \*

"II. *Variations of 24-hour care not requiring a hospital:*

a. *Small group crisis home:* up to eight children served· in a home for temporary or intensive care; psychiatric and nursing services available; admission to crisis home is on a short-term basis and patient turnover is fairly rapid (eight weeks or under).

b. *Small group home:* up to eight children requiring a different living situation but not in need of having a specialized treatment environment; psychiatric and nursing care services available on a consultative (or on-call) basis.

c. *Specialized small group living home:* designed for children needing long-term care of a specialized nature; this varies from the specialized psychiatric hospital in that the program is conducted in a small group home with not more than six children.

d. *Small group home clustering:* by clustering a number of small group homes in close proximity, it is possible to provide more effective psychiatric and nursing care

to a greater number of children; such closeness provides for easy patient movement from home to home; i. e., from a crisis home to a small group, non-crisis home.

e. *Therapeutic camp life:* generally used for intensive or extended treatment; allows children to participate in a therapeutic environment in a primitive but wholesome setting; psychiatric services available.

f. *Specialized foster parent program:* foster families selected to provide specialized foster care to disturbed children; such parents would be assisted through on-going instruction from mental health workers in therapeutic management of their disturbed foster children; a variation of this program would be specialized foster parents for weekends only, thereby providing a hospitalized child without a family a weekend home program.

g. *Rotating parent program:* parents to children in treatment share in the care of each other's children on daily, weekend, or weekly basis; such a program often provides intermittent relief for parents without having to hospitalize the child. The State should compensate the participating parent on an hourly basis.

h. *Home care services:* mental health treatment team (based in community or hospital) visits the child's home on a weekly basis, or more frequently if needed, in order to assist the parents in home management; in this way parents are taught treatment procedures and effective management while the child lives at home.

i. *Private child care agencies:* an arrangement whereby the State purchases care at numerous private child care agencies on a temporary, intensive, or extensive basis at private facilities providing 24-hour child care and treatment services, when families are not able to purchase services privately and the needed services are not available at public facilities." (Report of Commission at 26, 27).

\* \* \* \* \* \*

"ADMISSION GUIDELINES FOR CHILDREN AND YOUTH TO STATE HOSPITALS NEED TO BE MORE SPECIFIC.

\* \* \* In particular, the commission stresses the need to protect children and youth from being inappropriately admitted to state hospitals, and guidelines are needed for assisting admissions staff in determining appropriate alternative services." (Report of Commission at 51, 52).

\* \* \* \* \* \*

"THE MENTAL HEALTH LAWS OF GEORGIA SHOULD BE REVIEWED WITH SPECIFIC REFERENCE TO THE RIGHTS OF CHILDREN AND YOUTH." (Report of Commission at 60).

The Department of Human Resources in the more than two years since said detailed, more than 100 page report, has not endeavored to provide forms of care other than hospital confinement. Foster homes and specialized foster homes are in existence, but foster home parents generally don't accept these problem, emotionally disturbed and/or adolescent children. In addition, only 13 specialized foster homes with a capacity of two (2) children each, are in existence in this entire state.

In an appendix to its report the said study commission summarized the strengths and weaknesses at the then five hospitals. Note the following:

"(c) *type of children served at regional hospitals:* at three of the five regional hospitals the staff reports that a *majority of the children need not be hospitalized* if alternative services were available in the community. At the other two hospitals the staff reported that the *length of stay could be*

*significantly reduced* if there were adequate follow-up services. (italics supplied).

- Between 50–75% of children served in these institutions have no family or are part of severely dysfunctional family units (e. g., DFCS custody).
- More than 50% of children served are characteristically aggressive, anti-social, hyperkinetic or runaways, and non-psychotic. The child and youth population of the regional hospitals in many respects is similar to those identified as youthful offenders, except they have not been sentenced." (Report of Commission, Appendix at A–5, 6).

Are there now members of the plaintiffs' class in need of care other than in a mental hospital? In response to this question the defendants by letter dated January 24, 1976, submitted a list of hospitalized, plaintiff children compiled by the staff personnel of each regional hospital in response to a request "to designate the situation in which they would like to see the child placed in order to get optimal benefits." That list as of January 19, 1976, shows 46 children [18]

18. That list shows:

| Hospital | Initial | Age | ID # | Optimal Alternative Care Recommended |
|---|---|---|---|---|
| Savannah | P. J. | 15 | 11-7881 | Group Home |
| | B. B. | 16 | 15-9299 | Group Home |
| | T. J. | 14 | 11-1857 | Group Home |
| | J. L. | 13 | 98-1131 | Group Home |
| | J. K. | 15 | 00-1063 | Group Home |
| | J. J. | 9 | 00-1872 | Foster Care |
| | S. M. | 13 | 98-6034 | Group Home (MR) |
| Southwestern | P. S. | 12 | 64-93 | Group Home |
| | B. B. | 10 | 63-66 | Specialized Foster Home |
| GMHI (Children) | L. E. | 13 | 01-3487 | Residential Treatment |
| | J. A. F. | 11 | 01-3768 | Specialized Foster Care or Group Home |
| | H. K. | 10 | 00-9480 | Group Home |
| | D. D. | 13 | 01-2938 | Group Home (MR) |
| | R. W. | 10 | 01-5832 | Group Home |
| | J. F. | 12 | 01-5326 | Group Home |
| GMHI (Adolescent) | D. P. | 16 | 01-1334 | Residential Treatment |
| | M. W. | 14 | 01-3434 | Residential Treatment |

who could be optimally cared for in another, less restrictive, non-hospital setting if it were available.

Children eligible for A.F.D.C. or social security federal money are placed in privately operated, less restrictive settings.

These 46 children are not eligible for such federal money, and for them the State affords nothing other than hospitalization.

In exploring the lack of alternative care for these minor children the court

| Hospital | Initial | Age | ID # | Optimal Alternative Care Recommended |
|---|---|---|---|---|
| Central | J. L. | 12 | 172-897 | Specialized Foster Care |
| | T. L. | 12 | 191-700 | Specialized Foster Care |
| | J. R. | 13 | 173-617 | Specialized Foster Care or Group Home |
| | S. S. | 11 | 205-397 | Specialized Foster Care |
| | M. B. | 15 | 207-053 | Specialized Foster Care or Group Home |
| | S. B. | 15 | 206-001 | Specialized Foster Care |
| | J. C. | 15 | 196-470 | Specialized Foster Care (In Rome Hospital) |
| West Central | T. L. | 12 | 17-1093 | Group Home |
| | C. H. | 12 | 94-9963 | Group Home |
| | W. W. | 8 | 000-362 | Group Home |
| | T. B. | 15 | 000-227 | Group Home |
| | T. D. | 10 | 13-4127 | Specialized Foster Care |
| Augusta | L. O. | 12 | 15-8483 | Group Home |
| | J. D. | 14 | 00-2264 | Group Home |
| | A. H. | 6 | 00-2859 | Specialized Foster Care |
| | M. S. | 8 | 00-2637 | Specialized Foster Care |
| Atlanta | W. B. | 16 | 02-9667 | Residential Treatment |
| | L. W. | 16 | 96-6716 | Residential Treatment |
| | M. H. | 14 | 00-3853 | Residential Treatment or Specialized Foster Care |
| | D. D. | 13 | 00-3714 | Residential Treatment |
| | C. B. | 13 | 00-3666 | Structured Adolescent Day Program for MR |
| | J. H. | 9 | 00-3575 | Residential Treatment |
| | T. P. (Hospitalization needed unless mother will apply for admission to National Jewish Hospital) | 9 | 00-3452 | National Jewish Hospital Denver, Colorado (Program for emotionally disturbed children with an asthmatic program) |

was advised by the defendants that it costs approximately $40,000.00 per child per year to care for a child confined in one of Georgia's regional mental hospitals. The court has also been advised that a special group home operated by employees of the Department of Human Resources, Division of Mental Health, can accommodate and care for eight children and would cost $60,000.00 per year to operate—$7,500.00 per year per child.

For fiscal year 1966 the State budgeted some $1.9 billion and for fiscal year 1977 the Governor has recommended a budget of $1.922 billion. The court asked defendants to meet with the Governor and the Chairman of the Appropriations Committees of the House and Senate to determine whether or not appropriated funds of $180,000.00 to open three.[19] group homes for these children could be immediately made available. Defendant Dr. Skelton following a January 15, 1976, meeting responded:

"8.

"The Governor and Chairmen of the respective Appropriations Committees concluded that because of (1) the current state of the economy, (2) the necessity for adopting an austerity budget, (3) the inability of the State to afford new programs, (4) *their opinion that the regional hospitals were offering appropriate treatment for children,* and (5) the existence of more critical unmet needs, $60,000 could not be added to the 1976 budget nor $180,000 to the 1977 budget for three group homes for twenty-three (23) mentally ill children presently hospitalized." (italics supplied.)

"9.

"The Governor also determined that emergency funds were not available for new group homes for children.

"11.

"Departments were instructed by the Governor to plan for an increase in operational budget for fiscal year 1977 of only 1.9%. Such a small increase does not permit the addition of new programs unless absolutely essential." (Affidavit of Dr. W. Douglas Skelton).

The fiscal year 1977 budget of the Department of Human Resources as recommended by the Governor includes $1,779,000 for group homes/foster grandparents program for the mentally retarded—plaintiffs are not in the mentally retarded group—and $1,900,000 in the Governor's Emergency Fund.[20]

## THE DUE PROCESS CLAUSE AND ITS APPLICATION TO JUVENILES

Section 1 of the Fourteenth Amendment as here applicable states:

| Hospital | Initial | Age | ID # | Optimal Alternative Care Recommended |
|---|---|---|---|---|
| Atlanta (Cont'd) | H. T. | 16 | 94–5967 | Residential Treatment or Specialized Foster Care |
| | M. M. | 10 | 00–4199 | Group Home or Specialized Foster Care |
| | P. B. | 10 | 15–5190 | Specialized Foster Care |
| | W. H. | 11 | 17–7859 | Residential Treatment |
| | E. D. | 16 | 00–4320 | Specialized Foster Care or Group Home |
| | R. S. | 13 | 01–4267 | Specialized Foster Care or Residential Treatment |

19. At that time the defendants advised that 23 children were suitable for group homes of 8 children each.

20. See n. 12a.

". . . No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

Proposed to the States by Congress on June 13, 1866, this amendment had been ratified by them on July 21, 1868. As the Supreme Court said in 1876:

"While this provision of the Amendment is new in the Constitution of the United States as a limitation upon the powers of the States, it is old as a principle of civilized government. It is found in Magna Charta, and, in substance if not in form, in nearly or quite all the constitutions that have been from time to time adopted by the several States of the Union. By the 5th Amendment, it was introduced into the Constitution of the United States as a limitation upon the powers of the National Government, and by the 14th, as a guaranty against any encroachment upon an acknowledged right of citizenship by the Legislatures of the States." *Munn v. People of Illinois,* 1876, 4 Otto 123, 94 U.S. 113, 123, 24 L.Ed. 77, 83.

Called upon in innumerable cases to determine what adult persons are protected by the guaranties of this amendment, it nevertheless was ninety-one years before the Supreme Court was first called upon to decide whether or not this guaranty against encroachment, due process of law, "is requisite to the constitutional validity of proceedings in which a court reaches the conclusion that a juvenile has been at fault, has engaged in conduct prohibited by law, or has otherwise misbehaved with the consequence that he is committed to an institution in which his freedom is cur-

tailed." *In re Gault,* 1967, 387 U.S. 1, 12, 87 S.Ct. 1428, 1435, 18 L.Ed.2d 527, 537. In answering that question the Court stated:

"This Court has not heretofore decided the precise question. In *Kent v. United States,* 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966), we considered the requirements for a valid waiver of the 'exclusive' jurisdiction of the Juvenile Court of the District of Columbia so that a juvenile could be tried in the adult criminal court of the District. Although our decision turned upon the language of the statute, we emphasized the necessity that 'the basic requirements of due process and fairness' be satisfied in such proceedings. *Haley v. State of Ohio,* 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948), involved the admissibility, in a state criminal court of general jurisdiction, of a confession by a 15-year-old boy. The court held that the Fourteenth Amendment applied to prohibit the use of the coerced confession. Mr. Justice Douglas said, 'Neither man nor child can be allowed to stand condemned by methods which flout constitutional requirements of due process of law.' To the same effect is *Gallegos v. State of Colorado,* 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 [87 A.L.R.2d 614] (1962). Accordingly, while these cases relate only to restricted aspects of the subject, they unmistakably indicate that, whatever may be their precise impact, *neither the Fourteenth Amendment nor the Bill of Rights is for adults alone.*" *Id.* at 12, 87 S.Ct. at 1436, 18 L.Ed.2d at 538 (emphasis added).

▮ So it is that it is now firmly established [21] that all persons—children and adults—are protected by the prohibitions of the Fourteenth Amendment.

The breadth and scope of these constitutional rights is a more difficult ques-

---

**21.** *See, e.g., Breed v. Jones,* 421 U.S. 519, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975); ·*Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *Tinker v.*

*Des Moines Community School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); *Levy v. Louisiana,* 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968).

tion for the resolution of which it is appropriate in the beginning to consider the history and background of the statute herein attacked. First, the history as found in *Lessard v. Schmidt,* 349 F.Supp. 1078, 1084 (E.D.Wisc.1972):

"The common law had little need to concern itself with questions of adequate procedure for involuntary confinement because public institutions for the mentally ill were virtually non-existent. *See* 1 Blackstone, Commentaries 305 (Christian ed. 1827). In the colonies, parents and family were expected to care for their own mentally disabled. S. Brakel & R. Rock, The Mentally Disabled and the Law 4 (1971 ed.) [hereinafter cited as Brakel & Rock]. The first mental hospital in the United States was not established until 1751, with few additional institutions being built until the middle of the nineteenth century. As a result of the lack of facilities and limited medical knowledge of methods of treatment, those confined were generally clearly deranged and violent. Brakel & Rock, *supra,* at 5. A New York statute, enacted in 1788, distinguished between the 'furiously madd' who were 'so far disordered in their senses that they may be dangerous to be permitted to go abroad,' and who could be confined upon the issuance of a warrant by two or more justices, and other 'lunatics' who could be taken under the care and protection of friends and relatives. N.Y.Laws of 1788, ch. 31. Under these circumstances, few questions were likely to be raised regarding improper commitment.

"Gradually, as more asylums were built, the number of persons committed increased, and confinement was not limited to the obviously dangerous. The change in attitude was reflected in the courts. In 1845, an inmate of a Massachusetts institution for the insane brought a habeas corpus action, alleging that his commitment was illegal. Matter of Josiah Oakes, 8 Law Rep. 123 (Mass.1845). The Massachusetts Supreme Court held that

" 'the right to restrain an insane person of his liberty is found in that great law of humanity, which makes it necessary to confine those whose going at large would be dangerous to themselves or others. . . . And the necessity which creates the law, creates the limitation of the law. The questions must then arise in each particular case, whether a patient's own safety, or that of others, requires that he should be restrained for a certain time, and whether restraint is necessary for his restoration or will be conducive thereto. The restraint can continue as long as the necessity continues. This is the limitation, and the proper limitation.'

*Id.* at 125. Dangerousness to self thus became an additional criterion upon which commitment could be based. This criterion apparently rested on an assumption that a state could proceed as *parens patriae* to protect the interests of the person involved. The doctrine could be justified as a derivation of an English law, under which the King was appointed the guardian of the person and goods of a lunatic. A person found to be a lunatic was committed to the care of a friend who received an allowance with which to care for the unfortunate person. During 'lucid moments' the incompetent was permitted to manage his own property, and to generally exercise his civil rights. He was also entitled to an accounting from the King. There was thus a very real difference

"between the English practice, which could only be for the benefit and protection of the incompetent, and which was only effective during periods of insanity, and the American innovation, which resulted in total, and perhaps permanent, loss of liberty."

(footnotes omitted).

## THE DEVELOPMENT
## OF
## GEORGIA'S MENTAL HEALTH LAWS

Prior to the 1969 complete revision of Georgia's mental health laws,[22] proceedings to involuntarily commit a person to a mental hospital were conducted by a "lunacy commission", usually composed of two physicians and a lawyer, appointed by the ordinary.[23] The decision of the commission could be appealed to the superior court where a jury trial was available.[24]

The first authorization for a "lunacy commission" came in 1834 when the legislature established a procedure for the ordinary to appoint a guardian for any person found to be mentally incompetent by a commission of 12 persons, including one physician, appointed by the ordinary.[25] The appointment of a guardian was a significant step because guardians were authorized to confine wards in an asylum "if necessary for their own protection or the safety of others." [26] By 1872 the jurisdiction of the commission had been enlarged to cover commitment of citizens to the lunatic asylum.[27] Other than a change in the make-up of the commission to two doctors and a lawyer in 1918,[28] and procedural refinements relating to notice and the right of the alleged incompetent to counsel,[29] this basic scheme [30] existed until the present procedures were adopted in 1969. 1969 Ga.Laws 505.

The ordinary in 1872 also acquired the power, exercised by the inferior courts [31] prior to their abolition by the Constitution of 1868, to commit insane persons to the asylum when such persons "for public safety, or other good and sufficient reason, should no longer be left at large." [32] Acting under this authority, the ordinary could summarily commit persons alleged to be dangerously insane without resort to a lunacy commission.[33] This provision likewise survived into the 1933 code, 1933 Ga.Code § 49–612, *as amended* 1950 Ga.Laws 30, 31, and remained as law until its 1969 repeal.[34]

Judicial commitment, however, has not been the only method of civil hospitalization. In 1857 the legislature provided for the admission of a person to the hospital provided (1) that he did not complain and did not request a jury trial, (2) that someone was willing to pay his expenses, and (3) that evidence of insanity was provided by the certificate of three physicians.[35] The provision, first codified in 1863 Ga.Code § 1297, was carried through subsequent codifications, *e.g.*, 1933 Ga.Code § 35–228, and remained available until its repeal by 1960 Ga. Laws 837.

The first provision for truly voluntary admission to a mental hospital—and the first statute to make special provision for children—came in 1952. The legislature in that year authorized the admission of

"any individual who is mentally ill or has symptoms of mental illness and who, being sixteen years of age or over, applied therefor, and any individual under sixteen years of age who is mentally ill or has symptoms of men-

**22.** The adoption of present Ga.Code Ann. ch. 88–5, 1969 Ga.Laws 505.

**23.** 1933 Ga.Code § 49–604, *as amended* 1964 Ga.Laws 499, 534, *repealed* 1969 Ga.Laws 505, 541.

**24.** *Id.* § 49–606.

**25.** Act of 1834, 1 Cobb's 1851 Digest 343, *as amended* Act of 1835, 1 Cobb's 1851 Digest 345, *codified* 1863 Ga.Code §§ 1806–08.

**26.** 1863 Ga.Code § 1814.

**27.** 1872 Ga.Code § 1855.

**28.** 1918 Ga.Laws 162.

**29.** *E. g.,* 1964 Ga.Laws 499, 534–37.

**30.** *Codified* in 1933 Ga.Code § 49–604, *as amended* 1964 Ga.Laws 499, 534.

**31.** 1863 Ga.Code § 1815, *as amended* 1866 Ga. Laws 22.

**32.** 1872 Ga.Code § 1864. *See Strickland v. Peacock,* 209 Ga. 773, 778, 77 S.E.2d 14 (1953).

**33.** *See Dickson v. Hicks,* 160 Ga. 487, 128 S.E. 770 (.925); *Reagan v. Powell,* 125 Ga. 89, 53 S.E. 580 (1906).

**34.** 1969 Ga.Laws 505.

**35.** 1857 Ga.Laws 123.

tal illness, if his parent or legal guardian applied therefor in his behalf. . . ." 1952 Ga.Laws 94, 95. Admission under this statute was conditioned on the payment of expenses by the patient or someone acting on his behalf.[36]

Superseding this statute in 1960 was 1960 Ga.Laws 837, which provided that any person 18 years of age or older who voluntarily applied, or any person less than that age whose parent or guardian applied, could be admitted for "observation and diagnosis" without any requirement that mental illness or evidence of such be shown. Detention for "care and treatment" was to be given if the admitted individual was "found to be a mentally ill person."[37] Substantially similar voluntary provisions were retained in 1964 when Georgia comprehensively revised its public health laws, 1964 Ga. Laws 499, 532 (§ 88–502), and remained in effect until the present provisions were enacted in 1969.[38] A significant change in the law between 1964 and 1969 is that the 1969 statute authorizes detention for treatment if the admitted individual is found "to show evidence of mental illness,"[39] whereas the 1964 statute authorized detention of an admitted individual if he was "found to be a mentally ill person."[40]

## GEORGIA'S STATUTORY SCHEMES FOR THE MENTALLY ILL

It is also appropriate to more fully examine Georgia's entire statutory scheme for the hospitalization of the mentally ill.

## A. HOSPITALIZATION OF THE MENTALLY ILL.

As enacted by 1969 Ga.Laws 505 and informally codified as 1933 Ga.Code Ann. 88–5, Georgia's statutory scheme provides first that "the policy of the State is that no person shall be denied care and treatment for mental disorder . . ." § 88–502.2, and "each patient in a facility and each person receiving services for mental disorders shall receive care and treatment that is suited to his needs . . ." § 88–502.3(a).

Authority is first given for the voluntary admission of minors, adults and those already adjudged to be incompetent. Those sections—88–503.1 through 88–503.3—already quoted, are partially herein attacked.

For involuntary commitments there are provisions for judicial admissions of "a person . . . if he is mentally ill, and he is (a) likely to injure himself or others if not hospitalized or (b) incapable of caring for his physical health and safety." § 88–507.1. A petition alleging these criteria supported by a physician's statement of examination within the preceding five days and that said criteria are met, is filed in the court of ordinary. § 88–507.2. The alleged incompetent designates his own representative and the court selects a second representative from the following: "legal guardian, spouse, an adult child, parent, attorney, adult next-of-kin, or adult friend." Finding none, a guardian ad litem is appointed. § 88–507.3. Such appointments automatically expire after 90 days or lesser stated time. § 88–502.19. The court issues a commission to two physicians and a lawyer to examine the patient and report to the court as to his mental condition and need for hospitalization. The proposed patient is entitled to counsel; for indigents, counsel is appointed and paid by the court. Within five days and after written notice the court presides over a hearing with the commissioners present for the purpose of the commission receiving evidence. Within five days thereafter the commissioners file a written report. If the report is a unanimous finding of the said

36. 1952 Ga.Laws at 95.

37. 1960 Ga.Laws at 839.

38. 1969 Ga.Laws 505, 517, Ga.Code Ann. § 88–503.1.

39. Ga.Code Ann. § 88–503.1, 1969 Ga.Laws 505, 517.

40. 1964 Ga.Laws 499, 532 (§ 88–502).

criteria, the court orders hospitalization in a treatment facility, a regional hospital. § 88–507.3. An appeal lies to the superior court where the issue is submitted to a jury. § 88–502.16. The order of hospitalization authorizes retention of the patient for six months. § 88–507.3(j). If the superintendent believes hospitalization beyond six months is necessary, he must petition the court of ordinary for an order. The petition is served on the patient and his representatives. It includes notice of right to appointed counsel and to a hearing if requested. If no hearing is requested, the court of ordinary may order retention for an additional period not to exceed one year. If a hearing is requested, the hearing examiner holds an evidentiary hearing, and if he concludes that continued hospitalization is required, he orders it "and the treatment facility shall thereby be authorized to retain the patient for a period not to exceed one year." § 88–506.6. Appeals from such orders lie to the superior court. § 88–506.5.

Where the governing authority of the county authorizes its use, optional medical admissions procedures for involuntary commitment under the same criteria may be utilized. A person may be admitted to an emergency receiving facility upon a physician's certificate or order of the court of ordinary. § 88–504.2. He is there examined and within 24 hours released or transported to an evaluating facility. § 88–504.4. The evaluating facility—one of Georgia's regional mental hospitals—within five days must release him or initiate proceedings for involuntary hospitalization under § 88–506.3. That section permits hospitalization upon recommendation of the superintendent supported by the opinions of two examining physicians that the statutory criteria are met. Notice is given to the patient and his representatives of his right to apply immediately to the court of ordinary for appointment of counsel and for a hearing. If no hearing is requested, the patient may be retained for six months. If a hearing is requested, the court of ordinary holds it within five days and after hearing evidence determines whether or not the statutory criteria are met. If so, hospitalization may continue for six months. §§ 88–506.3 and 88–506.4. The remainder of the statutory procedure is thereafter as already described.

### B. THE JUVENILE COURT CODE OF GEORGIA.

Following the Supreme Court's decision in *In Re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) Georgia's then existing juvenile court laws were examined with a view of engrafting adult due process requirements into such procedures. As a result Georgia enacted a completely revised Juvenile Court Code denominated Code Title 24A. 1971 Ga. Laws 709.

Georgia's Juvenile Court Code, which applies to children under 17 years of age, provides that the juvenile courts of this state "shall have *exclusive* original jurisdiction over juvenile matters and shall be the *sole court* for initiating action: (1) Concerning any child . . ." (emphasis supplied) who, among other things "(a(2)) . . . is alleged to be in need of treatment or commitment as a mentally ill or mentally retarded child . . .." or is alleged to be unruly or deprived. § 24A–301.

An "unruly child" includes a child who "is habitually disobedient of the reasonable and lawful commands of his parent, guardian or other custodian, and is ungovernable . . .." § 24A–401(g). A "deprived child" includes a child who "is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals . . .." *Id.* (h).

Specific jurisdiction is also given "to appoint a guardian of the person or property of any child . . . Provided, that such appointment shall be made pursuant to the same requirements of notice and hearing" as in the court of ordinary, § 24A–302, where the interest of the child conflicts with the interest of

his parent, guardian or custodian. § 24A–3301.

Children may be taken into custody before or after a court proceeding begins but may not be detained unless detention "is required to protect the person or property of others or of the child. . ." Proceedings are begun by petition filed by any person, including a law enforcement officer, having personal or informed knowledge, subject to the condition that the court determine and endorse upon the petition that its filing is in the child's and the public's best interest. §§ 24A–1601 and 1602. Summons issues to the parents, guardian, custodian, guardian ad litem and the child if over 14 years of age. It includes notice of a hearing (within 10 days for a detained child), right to counsel and right to appointed counsel "if unable without undue financial hardship to employ counsel." § 24A–1701.

The public is excluded from knowledge of and access to all hearings. Hearings are conducted by the court without a jury and are recorded. "The court may temporarily exclude the child from the hearing except while allegations of *his* delinquency or unruly conduct are being heard." § 24A–1801.

While the child has a right to counsel, "counsel must be provided for a child not represented by his parent, guardian, or custodian." § 24A–2001.

The court may order the child examined by a physician or psychologist or order urgently needed medical or surgical treatment. § 24A–2101.

As to the disposition of mentally ill or mentally retarded children, § 24A–2601 provides:

"(a) If, at any time, the evidence indicates that a child may be suffering from mental retardation or mental illness, the court may commit the child to an appropriate institution, agency, or individual for study and report on the child's mental condition.

"(b) If it appears from the study and report that the child is committable under the laws of this State as a mentally retarded or mentally ill child, the court shall order the child detained and proceed within 10 days to commit the child to the *Georgia Department of Human Resources, Mental Health Division*." [41] (emphasis added).

"(c) If the child is found not to be committable, the court shall proceed to the disposition or transfer of the child as otherwise provided by this Code [Title 24A]."

For deprived children the court may fashion an order best suited to protect his "physical, mental and moral welfare", subject to statutory limitations not here relevant, § 24A–2301. Unruly children are disposed of the same as delinquent children. §§ 24A–2302 and 2303.

Juvenile court orders as possibly applicable to this case may not continue in force for more than two years and may be extended by order if a hearing is held after reasonable notice and there is a finding by the court that the extension is necessary. § 24A–2701.

The 1,111 children [42] admitted to Georgia's mental hospitals involuntarily in fiscal years 1969 through 1976 were admitted pursuant to one of these statutory procedures—mental health or juvenile court.

## THE STATUTE—SCOPE AND USE

### A. *The Application*—

The statutory concept as to the plaintiff class—children under 18 years of age—begins with an application for hospitalization being made "by his parent or guardian." § 88–503.1(a). In practice applications are made by parents and by

---

**41.** The defendants indicated that with regularity they receive juvenile court orders committing a child to a particular mental hospital instead of to the "Georgia Department of Human Resources, Mental Health Division". They fear that such orders unknowingly limit the department's authority to place the child in another mental hospital in which he can receive more suitable treatment.

**42.** See pages 119–120 of this opinion.

the 159 county Department of Family and Children Services where such county departments have been designated as custodian of a child by order of a juvenile court.

Psychiatrists, both those now employed by the State and those independent of the parties to this lawsuit, agree that "it's by now a truism in child psychiatry, a truism built over maybe fifty years of clinical experience in a wide variety of settings, that the pathology of children is inextricably related to the pathology of the family. . . ." More often than not the parents as well as the child might need psychiatric help.[43] "A disturbed child in the family can disrupt the family or the child's problems may be brought about, possibly, by the family strife and so forth, so . . . *rarely, if ever,* will you have a purely emotionally disturbed child in a family with no other problems there. So almost without exception, we're talking about family involvement in the child and adolescent program."[44] As further stated by another superintendent, "axiomatic in the treatment of children is to treat the parents and the child. It's considered to be a constellation of disturbances that exists, that where there is a mentally or emotionally disturbed child, that it relates to the parents." Therefore, "the parents and the child are all treated in the treatment plan for the child."[45]

While parents generally make such applications with the best of intentions and with the sincere desire to seek help for their child, the defendants nevertheless recognize what society knows but had rather not admit—"there are a lot of people who still treat [mental hospitals] as dumping grounds."[46]

As to those children for whom application is made by a county Department of Family and Children Services, the defendants now justify this practice by asserting that "the phrase 'parent or guardian' is sufficiently broad to encompass" such county departments "by reason of Ga.Code § 24A–2901" part of the Juvenile Court Act which provides:

"A custodian to whom legal custody has been given by the court under this Code [Title 24A] has the right to physical custody of the child, the right to determine the nature of the care and treatment of the child, including ordinary medical care and the right and duty to provide for the care, protection, training, and education, and the physical, mental, and moral welfare of the child, subject to the conditions and limitations of the order and to the remaining rights and duties of the child's parents or guardian."

and which they say "gives the custodian the legal right to hospitalize the child. . . ."[47] The defendants do not explain how the words "ordinary medical care" include long-term detention of a child in a mental hospital or why the inclusion in the Juvenile Court Act of a specific provision for the disposition by the juvenile court of mentally ill children, § 24A–2601, does not indirectly but explicitly say that the juvenile court and not a custodian, is to determine whether or not mentally ill children are to be hospitalized.

### B. Admission for Observation and Diagnosis and for Treatment.

Next, the statutory concept is for such an application to be presented to the superintendent of a regional hospital, who is authorized to receive a child "for observation and diagnosis." § 88–503.1(a). In practice children are received by being confined or placed in a regional men-

---

43. Dr. Eli Charles Messinger's deposition at 6.

44. Dr. Eugene C. Jarrett, III, Superintendent, Southwestern State Hospital at Thomasville, deposition at 40.

45. Dr. Lawson H. Bowling, Superintendent, Georgia Regional Hospital at Atlanta, deposition at 20.

46. Dr. John P. Filley, Director, Child and Adolescent Mental Health Services, deposition at 48.

47. February 11, 1976, letter of Assistant Attorney General R. Douglas Lackey.

tal hospital behind locked doors along with other children who are already there for care and treatment or for observation and diagnosis. Since application for discharge may be requested only after five days, receipt for observation and diagnosis means that the child is detained for a minimum of five days. § 88–503.3. There is no statutory maximum period.

The observation and diagnosis study is conducted under the supervision of a psychiatrist by psychologists and social workers. While no period of time is prescribed by statute or regulation, the general time consumed for such study seems to be about a week.

Then the statutory concept is that "if found to show evidence of mental illness and to be suitable for treatment, such person may be given care and treatment . . . and . . . may be detained by such facility for such period and under such conditions as may be authorized by law." § 88–503.1(a). In practice the language "evidence of mental illness and to be suitable for treatment" is as indefinite and elusive to the psychiatrists employed by the state as it is to a layman. Note the following portion of the deposition of Dr. John P. Filley, Director, Child and Mental Health Services:

"Q. I realize this is a very broad question, but when you say, 'Hospitalization is the appropriate treatment,' could you be somewhat more specific about the kinds of situations in which hospitalization becomes appropriate, what the family situation might be, why hospitalization is preferable at that time in the child's life.

"A. It can be quite a variety of circumstances that can make it appropriate for a child to be hospitalized. One would be a very acute, severe degree of disturbance. The child's behavior is quite out of control, and he needs to be in a contained environment until some stabilization is achieved through medication, through program and therapy and so on that brings about a greater degree of capa-

bility on the child's part to function within normal controls.

"Other situations, due to social circumstances the child's interaction with his parents may be in sort of a vicious circle pattern where it's getting worse and worse; and the parents are not able to change or interrupt this vicious circle; and a disturbance builds. It may be appropriate to hospitalize the child as part of breaking that cycle and achieving a more stable relationship.

"The broad general statement would be that these would be the two major conditions in which we say hospitalization is appropriate."

*Id.* at 9. In sum and substance Dr. Filley testified that the decision to hospitalize for care and treatment comes about in the following manner: "The parent may come in saying, 'I can't handle it any more; do something.' And, they say at the hospital or it might be the psychiatrist who says, 'I think hospitalization is indicated.' The parent would agree and that would decide it." *Id.* at 53.

The hospitalization of children for whom a county Department of Family and Children Services is custodian generally results from a determination that foster parental care is unavailable or has been tried and found to be unworkable, leaving hospitalization as the only available alternative. As already pointed out, Georgia has not yet provided other less restrictive forms of treatment. Ms. Hester Dixon, Social Services Consultant for the Department of Human Resources, has overall responsibility for foster care. She testified that most foster parents expect to provide short term care (deposition at 30), and that the State has trouble placing the following children in foster homes:

"Q. Okay. Are some children in your experience, to the best of your knowledge, more difficult to place, let's say, than other children?

"A. Yes.

"Q. Is there a great difference, let's say, between—how would—can you give us some examples of that, things that come to mind for you, like of a child that might be difficult to place?

"A. Well, generally a child twelve, thirteen years and older is more difficult to place, regardless. The age itself has a great deal to do with the problems of placement. A child—children who are bed-wetters are difficult to place—more difficult to place. Children who have come into contact with the courts are more difficult to place. Children who have—who have been diagnosed as having some kind of emotional problems are more difficult to place. Children with physical handicaps."

Deposition of Ms. Hester Dixon at 28.

J. R.'s history vividly illustrates what she is describing. Note also the testimony of the director of the county Department of Family and Children Services that participated in the decision to hospitalize J. R.: "The younger the child, the easier it is to find a [foster home] place. And, pre-school, very definitely, easy. For school age children it's hard to find homes for and teenagers, it's just about nil."[48]

C. *Discharge by Superintendent of Voluntary Patients.*

While the statute says that "the superintendent . . . shall discharge any voluntary patient who has recovered from his mental illness or who has sufficiently improved that the superintendent determines that hospitalization of the patient is no longer desirable. . . ." § 88–503.2, in practice in the absence of ready, willing, and able parents the superintendent is without means to effect this statutory command.

The information freely furnished to the court and heretofore summarized and the testimony of state employed psychiatrists consistently shows that "there are presently children hospitalized . . . who hospital personnel . . . indicate do not need to be institutionalized." The defendants do not regularly keep a list of such children because they "have no capability of affecting the situation." This unnecessary hospitalization continues in spite of the generally acknowledged fact that it is harmful for such children to continue to be unnecessarily hospitalized.[49]

The absence of parents ready, willing and able to again accept their child, is unfortunately a normal situation. As Dr. James B. Craig, now Superintendent of the Georgia Regional Hospital at Savannah and formerly Superintendent of Milledgeville State Hospital now called Central State Hospital, testified: "Yes, you always have a few of these [parents who are reluctant to take their children out of the hospital after the staff recommends discharge] because with the kinds of, say, cases you get admitted to a hospital, meaning that many times it's because of their disinterest and inability to get along that the child gets sick." (Deposition at 11).

Without available parents, the regional hospitals are dependent upon the Department of Family and Children Services to find a suitable placement. As already discussed, the only available placements are foster care and a limited number of specialized foster care which means that generally for emotionally disturbed children who have been hospitalized there is no available, suitable placement. If "D.F.A.C.S." is unable to take the child, he stays in the mental hospital.[50]

D. *Discharge on Application.*

According to the statute "a voluntary patient who is admitted . . . pur-

---

**48.** Deposition of Mrs. Gladelle Whitaker at 55.

**49.** Dr. John P. Filley, deposition at 60 and 73A.

**50.** Dr. John P. Filley, deposition at 73B.

suant to section 88–503.1, or his legal guardian, parent, spouse, attorney, or adult next-of-kin, may request his discharge in writing . . . If the patient was admitted before the age of 18 on the application of his parent or guardian under section 88–503.1, his discharge prior to becoming 18 years of age may be conditioned upon the consent thereto of his parent or guardian. . ." § 88–503.3. In practice the State takes this to mean that in the case of a voluntarily admitted child, his discharge can be requested only by his parent or guardian.[51] Children thus in practice have a right to leave only when the hospital and their parent or guardian agree.[52]

### E. Availability of Other Statutory Procedures.

§ 88–503.3(b) provides that "proceedings for the involuntary hospitalization of . . . a voluntary patient shall not be commenced unless the discharge of the voluntary patient is first requested as provided in subsection (a) hereof." In practice this means that a parent or guardian by not requesting the discharge of his child can effectively prohibit the child being considered for involuntary hospitalization pursuant to the heretofore discussed laws providing generally for the hospitalization of the mentally ill through the court of ordinary or in the juvenile courts of this state.

### F. Procedural Safeguards.

Neither the statutory scheme nor the practices and policies utilized by the defendants provide for any procedural safeguards. As the plaintiffs urge, children are institutionalized without a hearing or other procedural safeguards; are hospitalized without initial or periodic consideration of placement in the least drastic environment necessary for treatment; and are not afforded a hearing at any time for the determination of an appropriate required time for discharge.

In concept and practice the statute vests in parents and guardians, including the defendants as custodians, and in superintendents of state mental hospitals an unbridled discretion to admit and detain emotionally disturbed children in Georgia's mental hospitals at least until their 18th birthday.

### LIBERTY AND DUE PROCESS

Like O'Connor v. Donaldson, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396, (1975), and the question[53] therein posed and answered, this case raises the most important question of every child's constitutional right to liberty, not only the liberty that includes freedom from bodily restraint, Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042, 1045 (1922), but also the liberty that includes the freedom of an ordinary, every-day child in these United States of America—the freedom to live with mothers, fathers, brothers and sisters in whatever the family abode may be; the freedom to be loved and to be spanked; the freedom to go in and out the door, to run and play, to laugh and cry, to fight and fuss, to stand up and fall down, to play childish games; the freedom to go to school and to frolic with school mates; the freedom to go to Sunday school and church; the freedom to watch and listen or not to watch and listen to television; the freedom to buy candy at the corner store; the freedom to be a normal child in a normal household cared for by normal parents.

■ To unnecessarily confine and detain a child in a mental hospital and thereby cause him to possibly suffer severe emotional and psychic harm, Mat-

---

**51.** Dr. Lawson H. Bowling, Superintendent, Georgia Regional Hospital at Atlanta, deposition at 32.

**52.** Dr. John P. Filley, deposition at 109.

**53.** The court therein stated, "As we view it, this case raises a single, relatively simple, but nonetheless important question concerning every man's constitutional right to liberty." Id., at 573, 95 S.Ct. at 2492, 45 L.Ed.2d at 405. (emphasis added).

*thews v. Hardy,* 137 U.S.App.D.C. 39, 420 F.2d 607, 611 (1969), to demean himself, and to magnify social ostracism, *In re Ballay,* 157 U.S.App.D.C. 59, 482 F.2d 648, 667–69 (1973), is to deprive him of a child's freedom just as much if not more so than a child is deprived of his freedom by being civilly committed as a juvenile delinquent. *In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). To paraphrase what the Court there said: Ultimately, however, we confront the reality of that portion of the mental health process with which we deal in this case. A child is alleged to be emotionally disturbed. The child is admitted to a mental hospital where he may be detained and restrained of liberty for years. It is of no constitutional consequence—and of limited practical meaning—that the institution to which he is admitted and in which he is detained is called a hospital. The fact of the matter is that however euphemistic the title, a regional hospital named Central State Hospital or Georgia Mental Health Institution is an institution known by all as one for the confinement of mentally ill children and adults, in which the child is confined for a greater or lesser time. His world becomes a building with locked doors and windows, regimented routine and institutional hours. Instead of mother and father and sisters and brothers and friends and classmates, his world is peopled by psychiatrists, psychologists, social workers, state employees and children who are to a greater or lesser extent, also emotionally disturbed.

"In view of this, it would be extraordinary if our Constitution did not require the procedural regularity and the exercise of care implied in the phrase 'due process'", *In re Gault, supra,* 387 U.S. at 27, 87 S.Ct. at 1444, 18 L.Ed.2d at 546,

for children to be confined and detained under Georgia's voluntary admissions statute.

While the care that is implied in—the procedural regularity that is called for by the phrase "due process"—is flexible and such as the particular situation demands, *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), it traditionally includes at least the right after notice to be heard before an impartial tribunal. *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed.2d 158 (1932). As Daniel Webster's well-chosen words suggest, it "mean[s] a law which hears before it condemns, which proceeds on inquiry and renders judgment only after trial." (citation omitted). Black's Law Dictionary, Revised 4th Ed. at 590; partially quoted in *Powell v. Alabama, supra,* 287 U.S. at 68, 53 S.Ct. at 63, 77 L.Ed.2d at 170.

The defendants' contention that through this statute the state as *parens patriae* merely assists parents in the performance of their traditional parental duty of providing for the "maintenance, protection and education of his children," 1933 Ga.Code Ann. § 74–105, and is nothing more than a statutory confirmation of the liberty that parents and guardians have to direct the upbringing of children under their control, *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1924), *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1536, 32 L.Ed.2d 15 (1972) suggests that this statute gives to parents only the authority that they genuinely need to hospitalize their children and thus supplies the due process [54] that their situation demands. This contention overlooks the age-old principle that "the touchstone of due process is protection of the individual against arbitrary action of

---

54. It is also argued that parents and guardians can waive their child's constitutional rights, *In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), but for constitutional rights to be waived, they must first be statutorily recognized. Georgia's statute does not accord but instead abolishes all of a child's due process rights and says loud and clear that a child has no right to contest the decision of the parent

and the superintendent to hospitalize him. Secondly, even if the statute provided for waiver, appropriate due process protections herein absent would have to be provided as a condition to a valid parental waiver of a child's Fourteenth Amendment due process rights, *Kent v. United States,* 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966).

government, *Dent v. West Virginia,* 129 U.S. 114, 123, 9 S.Ct. 231, 233, 32 L.Ed.2d 623 (1889)," *Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S.Ct. 2963, 2976, 41 L.Ed.2d 935, 952 (1974). Most parents accept and faithfully perform their parental duties and given this unlimited statutory authority to admit their children to a mental hospital, would use that authority only when it is genuinely necessary to do so. Unfortunately, as the evidence indicates, there are some parents who abuse that authority and who under the guise of admitting a child to a mental hospital actually abandon their child to the state. As Dr. Filley suggested in his deposition, some still look upon mental hospitals as a "dumping ground". See text accompanying note 46, *supra.*

■ By this statute the state gives to parents the power to arbitrarily admit their children to a mental hospital for an indefinite period of time. Where "the state undertakes to act in parens patriae, it has the inescapable duty to vouchsafe due process . . . ." *Heryford v. Parker,* 396 F.2d 393, 396 (10th Cir. 1968), and this necessarily includes procedural safeguards to see that even parents do not use the power to indefinitely hospitalize children in an arbitrary manner.

The defendants further assert that nevertheless children are constitutionally protected by the independent judgment exercised by superintendents of Georgia's mental hospitals and their staff psychiatrists, psychologists and social workers. They say that the physician's license issued by competent authority is assurance that the physician possesses the requisite qualifications and will use them only in a child patient's best interest. *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). Defendants assert that plaintiffs by suggesting to the contrary are indicting the entire psychiatric branch of the medical profession.

■ The court is impressed by the conscientious, dedicated state employed psychiatrists who, with the help of equally conscientious, dedicated state employed psychologists and social workers, faithfully care for the plaintiff children to the extent that state furnished resources and facilities permit. Nevertheless, psychiatry according to psychiatrists is still an inexact science as to which there is the opportunity for wide, sincere differences of opinion among psychiatrists. The opportunity for such wide differences of opinion stems initially and primarily from the fact that psychiatry is dependent upon information that comes from the patient and from other people—parents, family, friends, and staff—who themselves have their own personal interests and problems in communication.[55] To suggest, as we here do, that psychiatrists are not infallible is not an indictment of psychiatry. It is simply to say that psychiatrists like all humans are capable of erring. Since they are capable of erring, psychiatrists like parents cannot statutorily be given the power to confine a child in a mental hospital without procedural safeguards being imposed to guard against errors in judgment and/or the arbitrariness that the best of us humans exhibit from time to time.

That state officialdom—knowing definitely since said November 1973 study commission report of the crying need for non-hospital, alternative resources for the care and treatment of plaintiff children, and further knowing from said report of the large number of children who would not need hospitalization if other forms of care were available—has failed to even endeavor to provide such alternative resources demonstrates that even well-meaning state officials cannot be given the unlimited statutory authority to determine under what circumstances and for how long plaintiff children will be confined and detained by the state in its mental hospitals. Their continued assertions in the face of this lawsuit that it is their opinion that Georgia's regional hospitals are offering these children appropriate treatment (Affidavit of Dr.

**55.** Dr. Eli Charles Messinger, deposition at 17.

Skelton following January 15, 1976, meeting with the Governor and Chairmen of the Senate and House Appropriations Committees), is small comfort to the 46 children who according to the defendants and their report of January 24, 1976, could now be treated and cared for in non-hospital surroundings if such were only available.

As was so appropriately said in *Covington v. Harris,* 136 U.S.App.D.C. 35, 419 F.2d 617 (1969):

"Not only the principle of judicial review, but the whole scheme of American government, reflects an institutionalized mistrust of any such unchecked and unbalanced power over essential liberties. That mistrust does not depend on an assumption of inveterate venality or incompetence on the part of men in power, be they President, legislators, administrators, judges, or doctors. It is not doctors' nature, but human nature, which benefits from the prospect and the fact of supervision. Indeed, the limited scope of judicial review of hospital decisions necessarily assumes the good faith and professional expertise of the hospital staff. Judicial review is only a safety catch against the fallibility of the best of men; and not the least of its services is to spur them to doublecheck their own performance and provide them with a checklist by which they may readily do so. *Id.* at 621–22.

■ It is thus apparent that this statute supplies not the flexible due process that the situation of the plaintiff children demands but, instead, absolutely no due process. It is also apparent that it affords to parents, guardians, the Department of Human Resources as Custodian, and superintendents the "unchecked and unbalanced power over [the] essential liberties . . ." of these children that is universally mistrusted by our "whole scheme of American government." The doublecheck that is needed

is that which is guaranteed by the Fourteenth Amendment—due process of law. There being none the statute in question violates the Due Process Clause of the Fourteenth Amendment and is unconstitutional.

## THE REMEDY

■ While no evidentiary hearing has been held, the information now furnished to the court indicates that the defendants as psychiatrists are of the belief that approximately 46 plaintiff children could be cared for in a less drastic, non-hospital environment if such an environment were available. The choices are many—

a. small group crisis home;

b. small group home;

c. specialized small group living home;

d. small group home clustering;

e. therapeutic camp life;

f. specialized foster parent program;

g. rotating parent program;

h. home care services, and *last but not least*

i. private child care agencies.

It is not for this court of three lay judges to choose the appropriate, less drastic form of care for each of these children; that decision we leave to the professional judgment of the defendant psychiatrists. It is, however, for this court to order [56] the defendants to proceed as expeditiously as is reasonably possible (1) to provide necessary physical resources and personnel for whatever non-hospital facilities are deemed by them to be most appropriate for these children, and (2) to place these children in such non-hospital facilities as soon as reasonably appropriate. The defendants shall further spend such money of the State of Georgia as is reasonably necessary to provide such non-hospital facilities and personnel and to place these

---

**56.** See *In re Gault,* 387 U.S. 1, 27, 87 S.Ct. 1428, 18 L.Ed.2d 527, 546 (1967), and *Jackson v. Indiana,* 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435, 451 (1972): "at the least, due process requires that the *nature and duration* of commitment bear some reasonable relation to the purpose for which the individual is committed." (emphasis added).

children in such non-hospital facilities. *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed. 287 (1970); *Griffin v. County School Board of Prince Edward*, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); *Wyatt v. Aderholt*, 503 F.2d 1305 (5th Cir. 1974).

■ The defendants as to every child under 18 years of age in their custody pursuant to this statute on the date of this order must within sixty (60) days:

(a) commence proceedings under Georgia's Juvenile Court Act or other mental health laws not herein found unconstitutional, or

(b) make necessary arrangements to completely remove the child from the custody of the defendants or any other official or agency of the State of Georgia.

The commencement of such proceedings will not terminate or deprive this court of further jurisdiction of every child who is a member of the plaintiff class. Jurisdiction is expressly retained for the following purposes:

(a) Receiving from the defendants semi-annual written reports to be filed within 30 days after each June 30 and December 31, under seal with the clerk of this court. Each such report shall contain a complete account of the defendants' compliance with this and all further orders, including complete copies of all legal and medical papers pertaining to every child under 18 years of age who within the reporting period is or has been in defendants' custody for hospital or non-hospital mental health voluntary care and treatment.

(b) Such further proceedings, hearings and orders as may be necessary to effect this remedial order.

Subject to the aforesaid the defendants, their agents, servants, employees, and attorneys and all persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, are hereby permanently enjoined and restrained from directly as the result of the request of a parent or guardian, or indirectly through the Department of Human Resources or any division or official thereof being appointed custodian, further detaining or confining any child under 18 years of age in any mental health facility in this state pursuant to the voluntary admissions by parent or guardian statute herein declared to be unconstitutional, to wit:

"§ 88–503.1 (a) The superintendent of any facility may receive for observation and diagnosis . . . any individual under 18 years of age for whom such application is made by his parent or guardian."

■ The plaintiff class having been allowed to proceed in forma pauperis, no security or bond is required for the issuance of the injunction. Rule 65(c), Federal Rules of Civil Procedure.

The issue necessitating the convening of this district court of three judges having been finally decided, this district court of three judges is hereby dissolved.

The parties are directed to appear at the United States Courthouse, Macon, Georgia, at 9:30 a. m. on the *21st* day of April, 1976, before the Honorable Wilbur D. Owens, Jr., United States District Judge, and to then report in full to the court on all efforts made to effect this order. At that time such further orders as are needed to clarify or make explicit the remedial order of this court, will be passed.

SO ORDERED, this the 26th day of February, 1976.